IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PHILLIP GIPSON,

    Petitioner,

v.

ROBERT HOREL,

    Respondent.

NO. C08-2526 TEH

ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Phillip Gipson is currently incarcerated by the California Department of Corrections and Rehabilitation at Pelican Bay State Prison in Crescent City, California. Petitioner filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, before this Court on May 19, 2008. After conducting an initial review of the petition, the Court ordered Respondent Robert Horel to show cause as to why the petition should not be granted. Respondent filed an answer on December 29, 2008, and Petitioner filed a traverse on February 5, 2009. After carefully reviewing the parties' written arguments, the record, and governing law, the Court now DENIES the petition for the reasons set forth below.

## I. BACKGROUND

On September 1, 2004, a jury in the Superior Court of Alameda County convicted Petitioner of second-degree murder and found various firearms enhancements to be true. On December 17, 2004, the trial court sentenced Petitioner to forty years to life. Petitioner timely appealed his conviction to the California Court of Appeal for the First District, which affirmed the conviction in an unpublished opinion on December 29, 2006. The California Supreme Court denied review on February 5, 2007. The grounds raised in the petition filed before this Court are the same as those raised in Petitioner's direct appeal.

The underlying facts of the case are not relevant to consideration of this petition because Petitioner challenges only the composition of the jury. Relevant facts regarding jury selection and Petitioner's claim of juror bias are presented in the discussion section below.

This Court has subject matter jurisdiction under 28 U.S.C. § 2254, and venue is proper in this district under 28 U.S.C. § 2241(d). The parties do not dispute that Petitioner has exhausted his state remedies as to all of the claims presented in this petition, nor do they dispute the timeliness of the petition.

## II.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court cannot grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C § 2254(d). A state court's decision is "contrary to" clearly established Supreme Court law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving materially indistinguishable facts but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 413-14 (2000). A decision is an "unreasonable application" of Supreme Court law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 414.

Holdings of the Supreme Court at the time of the state court decision are the only definitive source of clearly established federal law under AEDPA. *Williams*, 529 U.S. at 412. "While circuit law may be 'persuasive authority' for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme

2

1 Court's holdings are binding on the state courts and only those holdings need be reasonably
2 applied." *Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003) (citation omitted).

3       "[A] federal habeas court may not issue the writ simply because that court concludes
4 in its independent judgment that the relevant state-court decision applied clearly established
5 federal law erroneously or incorrectly. Rather, that application must be objectively
6 unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and
7 citation omitted). Moreover, in conducting its analysis, the federal court must presume the
8 correctness of the state court's factual findings, and the petitioner bears the burden of
9 rebutting that presumption by clear and convincing evidence. 28 U.S.C § 2254(e)(1).

## III. DISCUSSION

### A. Jury Selection

At trial, the prosecution used peremptory challenges to strike prospective jurors F.Y., P.J., and K.W., all African-American females. Petitioner asserts that the use of peremptory challenges against F.Y. and P.J. was unlawfully based on race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race"). His petition does not raise a *Batson* challenge as to K.W.

#### 1. Legal Standard

A three-step process is used to evaluate *Batson* claims. First, the defendant must make out a prima facie case by showing that the prospective juror is a member of a "cognizable racial group," that the prosecutor used a peremptory challenge to remove the juror, and that "the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-94, 96. Second, if the defendant makes the requisite prima facie showing, the prosecutor must articulate a race-neutral explanation for striking the juror in question. *Id.* at 97. Finally, if the prosecution sets forth a race-neutral reason, the trial court must determine whether that reason should be believed or whether "the defendant has established purposeful discrimination." *Id.* at 98.

3

When conducting its analysis during this third step, a court "must evaluate the prosecutor's proffered reasons and credibility under the totality of the relevant facts, using all the available tools including its own observations and the assistance of counsel." *Mitleider v. Hall*, 391 F.3d 1039, 1047 (9th Cir. 2004) (internal quotation marks and citation omitted). The court's evaluation "may include a comparative analysis of the jury voir dire and the jury questionnaires of all venire members, not just those venire members stricken." *Green v. Lamarque*, 532 F.3d 1028, 1030 (9th Cir. 2008). "If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005).

Where the state courts fail to consider the totality of relevant facts – for example, "[b]y merely reiterating the prosecutor's stated reasons, and then finding they were race-neutral, without analyzing the other evidence in the record to determine whether those reasons were in fact the prosecutor's genuine reasons" – the courts fail to fulfill their "affirmative duty to determine if the defendant had established purposeful discrimination." *Green*, 532 F.3d at 1031 (citations omitted). In these instances, the federal habeas court should not "presume the trial court found the prosecutor's race-neutral reasons for striking [a prospective juror] to be genuine when it denied [the defendant's] motion"; instead, the court must conduct *de novo* analysis to determine whether the defendant satisfied his burden of establishing purposeful discrimination. *Id.* On *de novo* review, the federal court must determine whether "[the state court's] decision that the prosecutor's strike [of a prospective juror] was not racially motivated was based on an unreasonable determination of the facts in light of the evidence presented." *Id.*

Improperly excluding a prospective juror on account of race is a structural error not subject to harmless error review; "actual harm is presumed to have resulted from the alleged constitutional violation." *Williams v. Woodford*, 396 F.3d 1059, 1069 (9th Cir. 2005). "[J]ust one racial strike calls for a retrial." *Kesser v. Cambra*, 465 F.3d 351, 369 (9th Cir. 2006) (en banc).

4

## 2. Factual and Procedural Background

At the trial underlying this habeas petition, defense counsel made a timely *Batson* motion after the prosecution exercised peremptory challenges to exclude prospective jurors F.Y. and P.J.[1] The trial court did not find that counsel had made a prima facie case of discrimination in part because one African-American female had been seated in the jury box from the beginning of jury selection and the prosecution had passed on exercising a challenge on five occasions.[2] Nonetheless, to create record for appeal, the trial court proceeded to the second *Batson* stage and asked the prosecution to set forth the basis for challenging F.Y. and P.J. The prosecutor explained as follows:

> As to [P.J.] there were three reasons. The first that she had previously served on a murder case in which just prior to deliberations the case was dismissed.
>
> Now, I don't know any of the details of the case, I've since learned a little bit. And didn't have any idea of the detail of the case at the time when I excused her, but I thought that that could not be good. There's even – either it was an 1118 motion [for a judgment of acquittal based on insufficient evidence], something wrong with the evidence, and in my opinion, that is not an ideal juror. That she may be skeptical and may distrust the prosecution from the beginning.
>
> Second was the negative experience with the police officer when she had the car accident. That was an experience where she apparently felt the officer lied and it caused her some appreciable amount of stress in both the event and what to do with it.
>
> And, finally, at that point in the proceedings, seat Number 1 was going through high [turmoil], and it appeared to me maybe one juror was going to fit the bill and we were down at the end of the first panel.
>
> And I believe I am permitted to take into account if there is a better juror that I think is coming up. And I did take that into account. I knew exactly who was left to fill that seat, and based on the questionnaires, I thought that they would be better jurors than somebody with the police interaction and the prior 187 [murder] on trial it was on. That's with respect to [P.J.].

---

[1] After prospective juror F.Y. was excluded, defense counsel indicated the potential for a *Batson* issue but explained that he was preserving the record and was not making a *Batson* challenge at that time. Resp. Ex. 4B at 87:1-26 (Rep. Tr.).

[2] Contrary to Petitioner's assertion that "[t]he jury was exclusively non African-American," Traverse at 9, this African-American juror remained seated on the jury as Juror Number 4. *See* Resp. Ex. 2 at 181 (Supp. Clerk's Tr. on Appeal).

> With respect to [F.Y.], she was a teacher and a journalist, two notorious liberal professions from my estimation. You'll notice that we've had a number of teachers hit the box so far. None of them are left. I haven't been the only one excusing teachers, but none of them are left.
>
> In addition, [F.Y.], as well as another woman, the second day sat right in the front row and wore purple that day, she was later excused for a hardship, and she was a Caucasian woman. But both those jurors stood out to me during the Court's comments initially with little or no eye contact with Your Honor as he was making – as you were making the introductory remarks.
>
> That – keeping with respect to both, that to me gave me a sense that these people might be – not necessarily disinterested in the proceedings, but not engaged. That was the primary reason for that challenge.

Resp. Ex. 4B at 171:13-173:1 (Rep. Tr.).

The trial court considered the prosecutor's proffered reasons and ruled as follows:

> All right. The record obviously reflects the basis. The Court would note that one of the other aspects and one of the things that [*People v. Wheeler*, 22 Cal. 3d 258 (1978),] and *Batson* both talk about is the knowledge that the trial judge has of the dynamics of the give-and-take or the flow of the jury selection process itself, as well as its familiarity with the reputations and the professionalism or lack thereof of the attorneys that practice before him.
>
> And I am familiar with both [defense counsel] and [counsel for the prosecution], and I am satisfied, again, that not only was there not a prima facia [sic] case, but even if one had been made that – [counsel for the prosecution] has stated clearly, general grounds that are not discriminatory in nature and are not designed to exclude a particular recognized cognizable group of the community from serving on this jury.
>
> Especially as I've indicated with passing on five separate occasions when one of the supposed suspected class has remained continuously occupied by her chair, chair four. And there are additional African-Americans in the audience section yet to be brought into the jury box.
>
> So the motion is denied. . . .

*Id.* at 173:2-22.

After the prosecution later exercised a peremptory challenge to exclude prospective juror K.W., defense counsel renewed his *Batson* challenge. The trial court initially stated that it did not find that defense counsel had made out a prima facie case as to the exclusion of

6

K.W. based on racial grounds, Resp. Ex. 4C at 213:23-26 (Rep. Tr.), but it subsequently observed that there was "some evidence by preponderance of the evidence that there may be a pattern" of excluding African-American jurors, *id.* at 214:11-15. The prosecution explained his reasons for excluding K.W. as follows:

> With regard to [K.W.], she had indicated personal contact with police and a firearm. It wasn't clear if it was an arrest. I believe she said it wasn't an arrest, but she had a firearm in her car and was contacted by police over that.
>
> Also, a personally – a welfare fraud case, and it was unclear whether it was charged or not. It appeared to have been charged, but resolved by her paying back the money.
>
> And then, recently, you know, she's about to fight a ticket that a police officer gave her who said – who apparently misrepresented himself. That's on a personal level with her contact – contact with the police.
>
> Then, in addition, she had indicated she had been shot in the hand. She didn't know why. It was a drive-by.
>
> That her brother was shot in a home-invasion style robbery where she wasn't present, although she was living at the residence at the time, and she apparently had some sort of social connection with these people who had come over from San Francisco and said they were going to rob somebody and had masks.
>
> And then, finally, she had indicated that her brother had been accused of rape, and then exonerated after six months in jail.
>
> And for those reasons, I exercised my peremptory.

*Id.* at 214:18-215-13.

The trial court then issued its ruling:

> The Court finds that there is no group bias involved in the exercise of the most recent challenge to [K.W.], and that they are predicated upon race[-]neutral grounds, nor does the Court find the pattern or belief that there is a pattern that each of the – in other words, looked at individually or put together collectively in light of the earlier comments and findings of the Court and the record that is set forth by [counsel for the prosecution]. And the targets and the times that were made there when the challenge is to [P.J.] and [F.Y.] were discussed. Therefore, the motion is denied . . . .

*Id.* at 215:17-26.

7

As he does here, Petitioner challenged the dismissal of prospective jurors P.J. and F.Y., but not K.W., on direct appeal. The California Court of Appeal affirmed the conviction, finding that:

> The trial court in this case made a sincere and reasoned effort to evaluate the reasons offered by the prosecutor for excusing prospective jurors F.Y. and P.J. In the first place, the court noted that the prosecutor's reasons were supported by the record. This determination was correct. Prospective juror F.Y. related during voir dire that she was a high school teacher of English and Humanities and that she had previously worked as a journalist for a local radio station, reporting on "community" events. It does not matter that the prosecutor's assumption – that any teacher or journalist may have a "liberal" bias – may be objectively unreasonable. What matters is whether the prosecutor's subjective estimation regarding these occupations was sincere and race neutral. (*See People v. Reynoso* (2003) 31 Cal.4th 903, 924-925 (*Reynoso*).) None of the 12 jurors the prosecutor ultimately accepted, regardless of race or gender, reported occupations as teachers or journalists. In our view, this supports the trial court's determination that the prosecutor's subjective aversion to those thus occupied was genuine and race neutral.
>
> While the record does not affirmatively disclose F.Y.'s lack of "eye contact" during the court's introductory remarks, the prosecutor's observation of this conduct is not *contradicted* by the record. Nor is this indication of inattentiveness an inherently implausible reason for exercising a peremptory strike. (See *Reynoso*, *supra*, 31 Cal.4th at pp. 925-926.) When the trial court accepts such a demeanor based and race-neutral justification as genuine, and it is neither contradicted by the record nor inherently implausible, we may rely on the presumption that the prosecutor properly relied on this reason. (*See People v. Allen* (2004) 115 Cal. App. 4th 542, 549.)
>
> Similarly, the record shows that prospective juror P.J. reported she had previously served as a juror in a murder case that was dismissed prior to any verdict. She also related an experience in which a police vehicle collided with hers, and her belief that the officer driving the police vehicle was both at fault and untruthful in explaining his fault. While she also stated she had had positive experiences with other police officers, it was nevertheless appropriate for the prosecutor to challenge her on the basis of her negative experience with law enforcement. (*People v. Turner* (1994) 8 Cal. 4th 137, 171 (*Turner*), disapproved on another ground in *People v. Griffin* (2004) 33 Cal. 4th 536, 555, fn. 5.) As for the prosecutor's belief that a prospective juror "better" than P.J. was coming up, this tactical estimation is, again, one that was neither inherently implausible nor contradicted by the record.
>
> The trial court also emphasized the fact that the prosecutor did not excuse another juror who was also an African-American

> woman, and that he had on five occasions passed on the opportunity to challenge that juror peremptorily. While this is not conclusive, it indicated the prosecutor's good faith in exercising his peremptory challenges and was an appropriate factor for the trial court to consider. (*Turner*, *supra*, 8 Cal.4th at p. 168.)
>
> Finally, the trial court noted its familiarity with the prosecutor's "reputation[] and . . . professionalism." In context, this remark implied that such familiarity gave the court no reason to doubt the subjective genuineness of the prosecutor's offered reasons. Such observation of a prosecutor's trial techniques and conduct further supports the trial court's sincere and reasoned evaluation in light of all relevant circumstances. (*See* [*People v. Guerra* (2006) 37 Cal. 4th 1067,] 1100.)
>
> In sum, we conclude the trial court's acceptance of the genuineness of the prosecutor's race-neutral reasons for challenging prospective jurors F.Y. and P.J. was made after a sincere and reasoned evaluation, and was a ruling supported by substantial evidence. Accordingly, we find no error in its denial of defendant's *Wheeler/Batson* motions.

Resp. Ex. 6 at 7-9 (*People v. Gipson*, Cal. Ct. App. decision, Case No. A108857 (Dec. 29, 2006)).

### 3. Analysis

The parties dispute the appropriate standard of review in this case. Petitioner contends that this Court must conduct a *de novo* review because the state courts failed to consider the totality of relevant facts in rejecting Petitioner's *Batson* claims at trial and on direct appeal. Respondent, on the other hand, points to evidence that the state appellate court considered relevant facts, including comparative juror review, when it noted, for example, that the prosecutor passed on multiple opportunities to remove an African-American woman who remained on the jury and that none of the seated jurors had reported occupations as teachers or journalists. *See id.* This Court need not decide whether *de novo* review or a more deferential standard applies because it finds, for the reasons discussed below, that Petitioner's claims would fail even under *de novo* review.

As to prospective juror F.Y., the prosecutor's justifications for exercising a peremptory challenge were her lack of eye contact with the court, showing a possible lack of engagement, and her profession. Petitioner correctly observes that the trial court failed to

9

1 make a factual determination as to whether F.Y. appeared to be disengaged and that, under
2 *Snyder v. Louisiana*, 128 S. Ct. 1203, 1209 (2008), it therefore cannot be presumed that the
3 trial court relied on the prosecutor's assertion concerning F.Y.'s demeanor.  However,
4 *Snyder* was decided well after the proceedings in this case, and it therefore was not clearly
5 established law at the time of the state court decisions at issue.

6 Moreover, even if the trial court rejected the contention that F.Y. showed signs of
7 disengagement, the second proffered reason for striking her is credible and race-neutral.
8 Petitioner points to two seated jurors and one alternate juror as similarly situated to F.Y., but
9 this Court finds that those three individuals were not, in fact, similarly situated.  First, Juror
10 Number 1 was a retired missile mechanic who had a daughter who was a teacher.  Resp.
11 Ex. 2 at 147-48 (Supp. Clerk's Tr. on Appeal).  Petitioner's claim may have had merit had
12 Juror Number 1's daughter been seated as a juror, but it is not unreasonable to consider
13 someone with a child working as a teacher to be differently situated from someone who him-
14 or herself works as a teacher.  Second, Juror Number 9 was a "music programmer (DJ) for
15 Radio@AOL (America Online)." *Id.* at 242.  This is a far cry from the five years F.Y. spent
16 as a radio journalist covering stories on "[e]verything that occurred in the community," Resp.
17 Ex. 4A at 50:9-19, and it is a stretch for Petitioner to equate "music programmer" and
18 "journalist" as similar professions.  Third, although Petitioner characterizes Alternate Juror
19 Number 2's occupation as "sports teacher," *e.g.,* Traverse at 6, she actually listed her
20 occupation as "Tri-Valley Haven – Domestic Violence/Rape Crisis/Homeless
21 shelter/services.  I do grants, website, women's self-defense, occassional [sic] staff back-up,
22 including crisis line and SART."  Resp. Ex. 2 at 300.  Someone who teaches women's self-
23 defense as one among several job responsibilities can reasonably be viewed differently from
24 someone currently teaching high-school English and someone who taught "Humanity and
25 English" in other school districts for six years prior to that.  Resp. Ex. 4A at 49:19-50:8.  In
26 short, F.Y.'s occupational history was not substantially similar to those of other jurors, and it
27 was not an unreasonable determination of the facts for the state courts to have concluded that
28 the prosecutor's challenge to F.Y. was legitimately based on her occupation rather than race.

10

1     As to prospective juror P.J., Petitioner dropped all discussion of her dismissal from
2 the jury in his traverse, thereby implicitly conceding the weakness of his argument. *See, e.g.,*
3 *United States v. Eric B.*, 86 F.3d 869, 879 n.21 (9th Cir. 1996) ("It may be inferred that
4 counsel for appellant concedes that this . . . argument is suspect, since appellant's reply brief
5 dropped all reference to this issue."). Nonetheless, the Court finds on examination of the
6 record that it was not unreasonable to conclude that the challenge to P.J. was not racially
7 motivated. The prosecutor offered three reasons for exercising a peremptory challenge: her
8 prior experience as a juror in a murder case that was dismissed, her negative experience in
9 one incident involving a police officer, and the prosecutor's opinion that a more favorable
10 juror would be seated in the jury box. Petitioner does not argue that similarly situated jurors
11 were allowed to remain on the jury; instead, he contends that the prosecutor's failure to
12 conduct adequate voir dire on the proffered reasons and his misstatement of the record
13 indicate that the proffered reasons were pretextual. However, Petitioner does not challenge
14 as racially motivated the prosecutor's explanation that he believed a more favorable juror
15 would be seated in the jury box following P.J.'s dismissal, and he therefore concedes that the
16 prosecutor proffered at least one race-neutral reason in support of challenging P.J.

17     In addition, the prosecutor's characterization that P.J. "apparently felt the officer lied
18 and it caused her some appreciable amount of stress in both the event and what to do with it,"
19 Resp. Ex. 4A at 171:25-172:1, was not inaccurate. P.J. stated during voir dire that she "was
20 not" satisfied with a police officer's explanation following an accident P.J. was involved in
21 with a patrol car, and that she considered filing a court action but chose not to based on "how
22 much stress [she] would be under if [she] took this to court." *Id.* at 96:21-97:19. In fact,
23 Petitioner himself stated in the petition that P.J. "did not believe the officer and thought the
24 accident was his fault." Pet. ¶ 9. Petitioner's argument that the prosecutor mischaracterized
25 P.J.'s statements is therefore unfounded. While P.J. did say that this incident was an isolated
26 incident and that she had "had rather pleasant experiences with other police officers," Resp.
27 Ex. 4A at 97:25-27, the prosecutor was not required to discount P.J.'s negative incident in
28 considering whether to exercise a peremptory challenge. The Court also does not find the

11

prosecutor's reliance on P.J.'s prior jury experience to be pretextual. Although he could have asked more questions concerning that experience during voir dire, it appears that the prosecutor's concern was the dismissal itself – i.e., that P.J. had sat through a prior jury trial only to have the case dismissed prior to deliberations – and further questioning would therefore not have been helpful. It may well be that neither of these reasons would be sufficient to remove P.J. from the jury for cause, but the Court finds them to be legitimate, race-neutral reasons for the prosecutor to have exercised a peremptory challenge.

The totality of relevant facts to be considered also includes the fact that an African-American woman remained on the jury, despite the prosecutor's having had multiple opportunities to remove her with a peremptory challenge. Additionally, the trial court noted his familiarity with the reputation and professionalism of both defense counsel and the prosecutor, implying, as the state appellate court found, that nothing in the prosecutor's background "gave the court reason to doubt the subjective genuineness of the prosecutor's offered reasons." Resp. Ex. 6 at 9.

Upon reviewing the record, this Court finds nothing to indicate that the state courts' rejection of Petitioner's *Batson* claims "was based on an unreasonable determination of the facts in light of the evidence presented." *Green*, 532 F.3d at 1031. Accordingly, granting a petition for habeas relief on these claims is unwarranted.

### B. Juror Bias

Petitioner also contends that his conviction must be vacated because the trial court refused to dismiss Juror Number 9 based on his wife's participation in the same parenting group as the prosecutor's wife. Petitioner contends that this relationship caused Juror Number 9 to be biased, and that failure to remove the juror therefore violated his right to an impartial jury.

#### 1. Legal Standard

A criminal defendant has a Sixth Amendment right to a "fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). "A court confronted with a colorable claim of juror bias must undertake an

12

investigation of the relevant facts and circumstances. . . . So long as the fact-finding process is objective and reasonably explores the issues presented, the state trial judge's findings based on that investigation are entitled to a presumption of correctness." *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) (en banc) (citations omitted). The question of juror partiality is "essentially one of credibility, and therefore largely one of demeanor. . . . The findings of state trial and appellate courts on juror impartiality [therefore] deserve a high measure of deference." *Tinsley v. Borg*, 895 F.2d 520, 525 (9th Cir. 1990) (internal quotation marks and citations omitted).

A single biased juror is sufficient to violate a defendant's right to trial by impartial jury. *Dyer*, 151 F.3d at 973. "The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice." *Id.* at 973 n.2 (citations omitted).

### 2. Factual and Procedural Background

In this case, the potential bias was not revealed until the final day of jury deliberations. Juror Number 9 sent the following note to the trial court:

> I may need to talk with you regarding a potential violation of your Admonition to the jury and/or conflict of interests regarding this case.
>
> I have just learned that my wife has a social connection to the wife of . . . the prosecuting District Attorney. Although I have been very scrupulous regarding maintaining the terms of your Admonition, both at home and at work, last night my wife blurted out that she thought she knew [the prosecutor's] wife through a new mother's parenting group that they are both in, and that they are our neighbors in central Berkeley. She said that earlier in the day, while the group was meeting, they had been talking and realized that I was probably a juror on the case the other woman's husband had just finished presenting evidence in. Last night my wife looked up the membership list of her mothering group on her computer and asked me, "Is his name . . . ?" and began to describe her friendship with his wife.
>
> I told my wife that we should not be discussing any aspect of the case, including her friendship with the DA's wife, and we cut the conversation short.
>
> I have never met either [the prosecutor] or his wife, and my wife has not met [the prosecutor]. I was unaware of this unexpected and coincidental connection until just now. I do not know if this information rises to the level that it would interfere with my

13

ability to sit as a juror in this case, but felt it was important that I
bring it to your attention as quickly as possible, so that it would
not influence or interfere with the jury's ability to reach a
decision in this case. I am at your disposal and ready to meet
with you regarding this information, if you feel it is necessary.

Resp. Ex. 1 at 112 (Clerk's Tr. on Appeal).

Following receipt of the note, the trial court questioned Juror Number 9, outside the presence of other jurors but with both counsel present, and then invited comments from counsel after Juror Number 9 returned to the jury room. The appellate court accurately summarized these proceedings:

> After receiving this note, the trial court brought Juror No. 9 from the jury room for questioning. The court inquired of this juror whether he felt that he was able to continue to serve on the jury and "be fair and impartial to both sides." Juror No. 9 said he did not think the situation he had described "would affect [his] reasoning or . . . thinking on the case," but he would "prefer to . . . step aside" if it "could be seen as a conflict of interest or anything that would affect the perception of the jury's decision." When the court asked the juror if a desire "to foster the relationship between [his] spouse and [the prosecutor's] spouse" might affect his decision in the case, Juror No. 9 replied again that he did not think his decision would be affected, but he was concerned about the "perception" of the situation. He stated that he could not "completely discount the possibility that [he might have] an increase of sympathy for [the prosecutor],"[3] but reiterated that he did not "think it [would] affect[] [his] consideration of the evidence. . . ." The court gave counsel an opportunity to request further areas of inquiry. Ultimately, the court concluded it was "satisfied" that Juror No. 9 could "stay on [the] jury," and it admonished Juror No. 9 not to discuss his "new discovery" with the other jurors.
>
> After Juror No. 9 returned to the jury room the court invited comment from counsel. Defense counsel requested that the court excuse Juror No. 9 and replace him with an alternate juror, based on the juror's comment that he might "now have sympathy" for the prosecutor.

Resp. Ex. 6 at 10 (footnote added).

The trial court denied the request and made the following findings:

> [W]ith regard to the issue of sympathy, . . . the Court's observation here in open court, that this is a common issue that

---

[3] Juror Number 9 explained that by "sympathy" he meant "in the sense because [he] learned that [the prosecutor is] a father of a young child" and "also in some way we're in a social circle together. I mean, now I don't feel the same separation as a complete stranger to him that I would to defense attorney, for example." Resp. Ex. 4J at 1784:15-21 (Rep. Tr.).

14

>arises in smaller communities and could arise here and I think it's very clear that this juror is very deeply introspective and [has] given it tremendous thought in evaluating his ability to proceed. It's reflected in the tenor of his letter. It's also reflected in his concern out of the appearance, the fact that tangential social relationship between his wife and [the prosecutor's] spouse, and how that could in some way have appearance.
>
>When we talk about sympathy, generally we're talking about doing stuff that perhaps somebody isn't going to be too terribly happy with. One can never really analyze what's going through the thinking processes of jurors, certainly during deliberations, but at this point in time I do not feel that there's sufficient legal cause to excuse Juror Number 9 from this jury and their deliberations.
>
>It's also reflective in the fact that from his demeanor, from his thoughtfulness and the fact that he has fully complied with the Court's instructions and [has] disclosed this, which is something that wouldn't necessarily have to have been disclosed or could have kept to himself, I suppose, but he didn't and did the things that he was supposed to do, as is also reflected in his responses here in open court. I think that he is fully capable of proceeding with the deliberations and giving both sides in the case a fair and impartial trial.

Resp. Ex. 4J at 1787:4-1788:4.

The state appellate court found that the record "amply supports the court's denial of defense counsel's request to excuse Juror No. 9. There was no error on this ground." Resp. Ex. 6 at 11.

### 3. Analysis

Having carefully reviewed the record, and giving appropriate deference to the trial court's evaluation of Juror Number 9's demeanor and credibility, this Court agrees that the trial court did not err when it denied Petitioner's request to excuse Juror Number 9.[4] The trial court conducted an appropriate and objective inquiry following receipt of the note from Juror Number 9, and the inquiry reasonably explored the issues presented. Petitioner has failed to demonstrate that the trial court's finding that Juror Number 9 remained capable of

---

[4] The Court rejects Petitioner's contention that an evidentiary hearing is necessary to resolve this claim. Unlike in *Fields v. Woodford*, relied on by Petitioner in support of his request for a hearing, there is no ambiguity here on any material issue. *See Fields*, 309 F.3d 1095, 1105-06 (9th Cir. 2002), *amended on other grounds*, 315 F.3d 1062 (9th Cir. 2002) (remanding to district court for evidentiary hearing on whether juror intentionally concealed information or gave a misleading response during voir dire).

15

1  serving as an impartial juror was unreasonable.  To the contrary, Juror Number 9 brought the
2  issue to the Court's attention; had never met either the prosecutor or his wife; and cut off the
3  conversation about this topic with his wife shortly after it started.  There is no indication that
4  Juror Number 9 was in any way improperly influenced by what the trial court correctly
5  characterized as a tangential relationship with the prosecutor.  Although the juror stated that
6  he could not completely discount the possibility that he might have increased sympathy for
7  the prosecutor based on their shared new fatherhood and wider social circle, he also
8  repeatedly stated that any such feelings would not impair his ability to evaluate the evidence
9  objectively and would not affect his decision-making.  These statements were unequivocal –
10 *e.g.*, Resp. Ex. 4J at 1781:21-23 ("I don't think that there's anything in [the letter] that would
11 affect my decision or my reasoning in the case . . . ."); *id.* at 1782:21-26 (nothing in the
12 newly discovered connection to the prosecutor that would cause Juror Number 9 to view the
13 defendant differently); *id.* at 1784:11-13 ("I don't think it would affect how I've already
14 considered the case."); *id.* at 1784:21-23 ("I don't think that it affects my consideration of the
15 evidence . . . ."); *id.* at 1785:4-5 ("I don't think it will affect my decision making.") – thereby
16 distinguishing this case from *United States v. Gonzalez*, 214 F.3d 1109, 1113 & n.5 (9th Cir.
17 2000) ("Asked three times whether she could put that experience aside and serve fairly and
18 impartially, [the juror] never affirmatively stated that she could.  Instead, she equivocated
19 each time [by saying, 'I'll try']." (footnote omitted)); *see also id.* at 1111 (juror "never stated
20 affirmatively that she could put aside her personal experiences, nor did she ever state that she
21 could be fair or impartial").  In light of all of the above, the trial court's refusal to excuse
22 Juror Number 9 was not contrary to law and, moreover, was based neither on unreasonable
23 factual determinations nor an unreasonable application of clearly established law governing a
24 defendant's right to trial by impartial jury.
25 //
26 //
27 //
28 //

## IV. CONCLUSION

For all of the above reasons, Petitioner has failed to show that he is entitled to habeas relief in this case. Accordingly, with good cause appearing, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**

Dated: 07/24/09

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT